UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JONATHAN ESQUEDA, M.D.,

Plaintiff,

-against-

NYU LANGONE HOSPITALS, NABIL N.
DAGHER, M.D., H. LEON PACHTER, M.D.
F.A.C.S., BONNIE LONZE, M.D., BRUCE
GELB, M.D., ZOE STEWART-LEWIS, M.D.,

Defendants.

21-CV-10267-LTS-SLC

---

<u>Memorandum Opinion and Order</u>

Jonathan Esqueda, M.D., ("Esqueda" or "Plaintiff") brings this employment discrimination action against Dr. Nabil Dagher ("Dagher"), Dr. H. Leon Pachter ("Pachter"), Dr. Bonnie Lonze ("Lonze"), Dr. Bruce Gelb ("Gelb"), and Dr. Zoe Stewart-Lewis ("Stewart-Lewis") (collectively, the "individual defendants") in their corporate and individual capacities, and against his former employer, NYU Langone Hospitals ("NYU") (together, with the individual defendants, the "Defendants"), asserting claims for hostile work environment and discrimination on the basis of his race and national origin, as well as for retaliation, under Title VII of the Civil Rights Act of 1965 ("Title VII"), 42 U.S.C. § 2000e <u>et</u> <u>seq.</u>, 42 U.S.C. § 1981 ("Section 1981"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 <u>et</u> <u>seq.</u>, and the New York City Human Rights Law ("NYCHRL"), N.Y. Code § 8-107 <u>et</u> <u>seq.</u> (Docket entry no. 1 (the "Complaint").)  The Court has subject matter jurisdiction of this action under 28 U.S.C. sections 1331 and 1367.

Pending before the Court is Defendants' motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on all claims.  (Docket entry no. 65 (the "Motion").)  The Court has considered carefully the parties' submissions and, for the following

reasons, grants Defendants' motion for summary judgment as to Plaintiff's federal claims and declines to exercise supplemental jurisdiction of Plaintiff's remaining claims.

<u>BACKGROUND</u>

Except as otherwise noted, the following material facts are undisputed.[1]

Plaintiff Esqueda is a forty-year-old surgeon whose national origin is Mexican and whose ethnicity is Hispanic.  (Complaint ¶ 1.)  Around 2018, Esqueda applied for and was accepted to a transplant surgery fellowship at NYU, where he worked from August 1, 2018, until his termination on December 30, 2019 (the "Relevant Period").  (Def. 56.1 ¶ 1.)

Doctor Nabil Dagher was NYU's director of the transplant surgery fellowship and Plaintiff's direct supervisor during the Relevant Period.  (Docket entry no. 69 ("Dagher Decl.") ¶¶ 2, 12, 15.)  Doctors Gelb, Lonze, and Stewart-Lewis were all transplant surgeons at NYU during the Relevant Period and worked directly with Plaintiff as mentors, supervisors, and trainers.  (<u>See</u> docket entry nos. 67 ("Lonze Decl."); 68 ("Gelb Decl."); 71 ("Stewart-Lewis Decl.").)  Doctor Pachter was the Chair of the Department of Surgery at NYU and had no direct interaction with Plaintiff during his fellowship.  (Def. 56.1 ¶ 51; docket entry no. 70 ("Pachter Decl.") ¶¶ 2, 4.)

As part of the fellowship application process, Esqueda had dinner in-person with Dagher, Gelb, and Lonze.  (Def. 56.1 ¶ 2.)  At that time, Dagher, Gelb, and Lonze were all aware of Plaintiff's national origin and ethnicity.  (<u>Id.</u> ¶¶ 2-4.)  After their dinner with Esqueda, the

---

[1]     The facts presented or recited as undisputed are drawn from the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1, or from evidence as to which there is no non-conclusory factual proffer.  Citations to Defendants' Local Civil Rule 56.1 Statement (docket entry no. 65-1 ("Def. 56.1")) or Plaintiff's Rule 56.1 Statement (docket entry no. 77 ("Pl. 56.1")) incorporate by reference citations to the underlying evidentiary submissions.

team recommended him for a one-year fellowship with the NYU Langone Transplant Institute

Abdominal Surgery Program beginning on August 1, 2018, with the option to renew for a second

year.  (Id.; Dagher Decl. at Ex. A ("Offer Letter").)  On April 25, 2019, Plaintiff's fellowship was

renewed for a second year from August 15, 2019, to August 14, 2020.  (Def. 56.1 ¶ 10; docket

entry no. 69-2 ("Renewal Letter").)

       Esqueda was one of at least three fellows in the program and was expected to

perform various patient-care responsibilities along with his two co-fellows, specifically, non-

parties Holly Foote and Shani Fruchter.  (Def. 56.1 ¶¶ 6, 12; see also docket entry no. 78-1

("Esqueda Dep.") at 99:8-10.)  Both of Esqueda's identified co-fellows were "North American-

born"[2] and Caucasian.  (Pl. 56.1 ¶ 48; Esqueda Dep. at 234:19-22.)  Fellows were expected to

divide coverage amongst themselves to determine who would be on call during weekends and

holidays.[3]  (Def. 56.1 ¶ 47.)  Plaintiff asserts, and Defendants dispute, that he was expected to

work longer hours, was given more overnight, holiday, and weekend shifts, and was denied

vacation days more frequently than his co-fellows.  (Id.; Pl. 56.1 ¶ 54; Esqueda Dep. at 98-99.)

Additionally, Plaintiff asserts (and Defendants dispute) that Esqueda was subjected to ridicule

and targeted harassment on several occasions when Dr. Dagher (and unnamed others) mocked

his accent, made derogatory comments telling him to "go back to Mexico," yelled at him in the

Operating Room ("OR"), and physically shoved him.  (Pl. 56.1 ¶¶ 55-56.)

---

[2]    Plaintiff alleges the national origin of each of his co-workers by reference to their "North American national origin."  (See, e.g., Complaint ¶¶ 49, 53.)  Although Mexico is also part of North America, the Court notes that, contextually, it appears that Plaintiff intends to allege that these co-workers do not share his Mexican national origin.

[3]    Although Plaintiff characterizes this statement as "disputed," he fails to identify any evidence supporting a contradictory interpretation of patient-care responsibilities, including in his own deposition testimony, and therefore fails to establish a genuine dispute regarding this fact.  (See Pl. 56.1 ¶ 47.)

Defendants assert, and Plaintiff disputes, that within the first few months of his fellowship, Esqueda displayed serious deficiencies in his performance in various key areas, including his medical knowledge, professionalism, interpersonal and communication skills, and system-based practice.  (Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8.)  In particular, Defendants proffer various emails and complaints made by Plaintiff's supervisory attending surgeons and Nurse Practitioners who, on several instances, complained of Plaintiff's lack of preparedness, inability to formulate effective treatment plans, poor and untimely communication about critical issues, and his failure to attend "signout" handoff procedures when leaving or beginning a shift. (Dagher Decl. at Exs. J, K, N, and S.)

As a result of these concerns, on May 30, 2019, Dagher sent Esqueda a "Notice of Remediation Plan," which set forth an improvement plan for remediating Esqueda's performance between June 5, 2019, and July 5, 2019.  (Def. 56.1 ¶¶ 13-14.)  Based on a series of intermittent evaluations, which consistently reported that Plaintiff was "seriously deficient" or "below average" compared to his peers, the Remediation Plan was extended several times to September 6, 2019.  (Id. ¶¶ 15-26.)  On September 23, 2019, Dagher provided Plaintiff with a Notice of Probation.  (Id. ¶ 30; see also Dagher Decl. at Ex. O ("Notice of Probation").)  The Notice of Probation outlined various new steps in a "New Improvement Plan" for Plaintiff's identified areas of deficiency and informed Plaintiff that, at the end of the 8-week probationary period, further corrective or disciplinary action may occur.  (Notice of Probation at 8.)  Plaintiff's October performance evaluations showed "marginal improvement," but continued to reflect a "below average" rating.  (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32.)  Beginning in November 2019, Plaintiff's Probationary Period was extended several times to January 20, 2020, because of his continued unsatisfactory performance.  (Def. 56.1 ¶¶ 33-36; Pl. 56.1 ¶¶ 33-36.)

On the evening of December 8, 2019, Plaintiff was on call overnight.  (Def. 56.1 ¶ 36.)  When Dr. Stewart-Lewis tried to contact Plaintiff to provide certain information, he did not respond to her calls or texts for at least fifty minutes.  (Id. ¶ 37; see also Dagher Decl. at Ex. U (Plaintiff's "Suspension Response").)  Because of this incident, Plaintiff was informed on December 10, 2019, that he was placed on an immediate, paid Administrative Leave of Absence.  (Def. 56.1 ¶ 38; Dagher Decl. at Ex. S ("Leave Notice").)  On December 17, 2019, Plaintiff was informed that he was being placed on an unpaid suspension and was directed to respond to the allegations concerning the events that were set forth in the Leave Notice.  (Def. 56.1 ¶¶ 39-40.)  On December 21, 2019, Plaintiff submitted his written Suspension Response to Drs. Dagher and Pachter and non-parties Michael Ambrosino and Montgomery.  (Suspension Response.)  The Suspension Response disputed details regarding the precise length of time Plaintiff took to respond to Dr. Stewart-Lewis and lodged a formal complaint that he was being targeted on the basis of his race and national origin.  (Def. 56.1 ¶¶ 42-44; Suspension Response.)

Following Plaintiff's discrimination complaint, NYU's Employee and Labor Relations Department of Human Resources investigated his allegations and issued an Investigation Report finding his allegations to be without support.  (Def. 56.1 ¶¶ 45-46; Dagher Decl. at Ex. V ("HR Investigation Report").)  On December 30, 2019, Dagher recommended to the Chair of the Department, Pachter, that Plaintiff be terminated, identifying various deficiencies in Plaintiff's performance and the unsuccessful attempts to ameliorate those issues.  (Def. 56.1 ¶¶ 48-49.)  On December 30, 2019, Dr. Pachter terminated Plaintiff's employment.  (Id. ¶ 50.)  Plaintiff filed an internal appeal of his suspension and dismissal to NYU's Appeals Committee, per employee policy, and his appeal was denied.  (Id. ¶ 52.)

<u>D<small>ISCUSSION</small></u>

<u>Standard of Review</u>

Summary judgment is appropriate when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-26 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.  Thus, the claim of a party that is unable to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will not survive a Rule 56 motion.  <u>Celotex</u>, 477 U.S. at 322.  Specifically, the party who bears the burden of proof at trial "must do more than simply show that there is some metaphysical doubt as to the material facts and they may not rely on conclusory allegations or unsubstantiated speculation." <u>Jeffreys v. N.Y.C.</u>, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted).  The moving party bears the burden of demonstrating the absence of a material fact, and the court must be able to find that, "after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact could find in favor of that party." <u>Marvel Entm't, Inc. v. Kellytoy (USA), Inc.</u>, 769 F. Supp. 2d 520, 523 (S.D.N.Y. 2011) (quoting <u>Heublein v. United States</u>, 996 F.2d 1455, 1461 (2d Cir. 1993)).  Where the party opposing summary judgment "fails to properly address [the moving] party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

Federal Claims

Plaintiff asserts federal claims under Title VII and Section 1981 for hostile work environment and discrimination on the basis of his race and national origin, and for retaliation after he filed a protected discrimination complaint.  (Complaint.)  While Plaintiff styles his race and national-origin discrimination claims as arising under both statutes (id.), Section 1981 only prohibits discrimination on the basis of race, not on the basis of national origin.  See Village of Freeport v. Barrella, 814 F.3d 594, 606 (2d Cir. 2016).  Additionally, although Plaintiff asserts all claims against "All Defendants" (Complaint), Title VII does not provide for individual liability.  See Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010).  Section 1981, however, allows for individual liability where plaintiff demonstrates "some affirmative link to causally connect the actor with the discriminatory action."  Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000) (internal citation omitted).  Therefore, the Court will discuss the merits of Plaintiff's federal claims asserted against the individual defendants under Section 1981 only with respect to the alleged race-based hostile work environment, discrimination, and retaliation.  To the extent that Plaintiff attempts to assert additional Section 1981 claims on the basis of national-origin discrimination, or claims against the individual defendants under Title VII, the claims are dismissed with prejudice as contrary to established law.

Hostile Work Environment

Hostile work environment claims brought under Title VII and Section 1981 are assessed using the same standard.  Banks v. Gen. Motors, LLC, 81 F.4th 242, 261-62 (2d Cir. 2023).  To prevail on a motion for summary judgment, Plaintiff must establish a triable issue of fact regarding three elements: (1) he suffered conduct that was "objectively severe or pervasive" such that it "create[d] an environment that a reasonable person would find hostile or abusive";

(2) he "subjectively perceive[d]" the environment as "hostile or abusive"; and (3) such an environment was created because of his protected characteristics.  Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (citing Gregory v. Daly, 243 F.3d 687, 691-92 (2d Cir. 2001)).  As to the first element, the Court must assess the objective hostility of the environment by considering the "totality of circumstances," focusing on four main factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening and humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993).  "[N]o single factor is required," id., but "'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are generally insufficient to sustain a hostile work environment claim."  Zheng-Smith v. Nassau Health Care Corp., 486 F. Supp. 3d 611, 624 (E.D.N.Y. 2020) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Plaintiff argues he was subjected to a hostile work environment based primarily on his assertion that, on multiple occasions, Dr. Dagher "and others" mocked his accent.  (Docket entry no. 79 ("Pl. Mem.") at 5.)  In support, he proffers his testimony regarding a single incident where Dagher allegedly mocked the way Plaintiff said the word "subtle" due to his accent from growing up in Mexico.  (Esqueda Dep. at 86:10-15.)  Plaintiff also testified that Dagher remarked that he "thought that Mexicans only work in restaurants" and stated, "several times," that Plaintiff should "go back to Mexico in a very disrespect [sic] – not in a very positive way."[4]  (Id. at 86:12-21, 159-60.)  Esqueda also testified that unnamed fellows made comments

---

[4]    Defendants contest the veracity of Plaintiff's deposition testimony, proffering Dagher's contradictory testimony, and argue that Plaintiff cannot identify a single witness to these alleged incidents despite alleging that these comments were made in the OR, with a surgical team present.  (Docket entry no. 73 ("Def. Mem.") at 22-23.)  At summary judgment, however, the Court cannot "weigh evidence or assess the credibility of

that, "Mexico's money is not really – has no real value or something like that," and "they sell

organs in Mexico," (id. at 155:3-6) and that Dr. Stewart-Lewis "probably . . . said something like

go back to Mexico."  (Id. at 167:3-4.)  Plaintiff testified that none of the other individual

defendants ever made any comments regarding Mexico or Hispanics.  (Id. at 165-66.)

   From the record presented, Plaintiff has failed to proffer facts sufficient to

establish a triable issue of fact as to whether the alleged harassment was sufficiently severe or

pervasive to constitute a hostile work environment.  Plaintiff identifies a pattern of offensive

comments made over the course of his 17 months of employment at NYU.  To support a finding

of a hostile work environment, however, the evidence must show that the behavior complained

of was so severe or pervasive that his workplace was "permeated with discriminatory

intimidation, ridicule, and insult" such that it altered the conditions of his employment.

Varughese v. Mount Sinai Med. Ctr., No. 12-CV-8812-CM-JFM, 2015 WL 1499618, at *18

(S.D.N.Y. Mar. 27, 2015).  The identified comments are not threatening or intimidating; they are

best described as "mere offensive utterance[s]" which do not rise to the standard of altering the

very conditions of Plaintiff's workplace.  Harris, 510 U.S. at 23; see, e.g., Augustin v. Yale Club

of N.Y.C., No. 03-CV-1924-KMK, 2006 WL 2690289, at *22 (S.D.N.Y. Sept. 15, 2006) (finding

that isolated incidents of even extremely offensive comments spread out over a plaintiff's five

years of employment are not sufficient to show a hostile work environment).  Furthermore,

Plaintiff fails to provide evidence as to the actual frequency of these comments; from the record

---

witnesses."  Frost v. N.Y.C. Police Dep't, 980 F.3d 231, 242 (2d Cir. 2020).  Those
determinations are "within the sole province of the jury."  Id. (citation omitted).
Therefore, at this stage, Plaintiff's testimony must be taken as truthful and construed in
the light most favorable to him.  For those reasons, even without further corroboration or
support in the record, Plaintiff's statements are sufficient to establish a triable issue of
fact regarding Dagher's alleged discriminatory comments.  See, e.g., Kohutka v. Town of
Hempstead, 2 F. Supp. 3d 378, 382 (E.D.N.Y. 2014).

presented, Plaintiff describes a singular incident where Dr. Dagher mocked his accent and states that he was told to go back to Mexico "several" times, but he does not provide evidence from which a reasonable jury could conclude the comments were "'continuous and concerted' or constituted a 'steady barrage of opprobrious . . . comments.'"  Kho v. N.Y. & Presbyterian Hosp., 344 F. Supp. 3d 705, 722 (S.D.N.Y. 2018) (quoting Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015)).

    Finally, Plaintiff also proffers testimony describing two incidents in which he alleges Dagher "pushed me during the transplant . . . .  He yelled at me, yelled at me and screamed at me and talking [sic] profanity," and another incident where Dagher said, "if you ever present a patient like . . . the way that you presented him, I will destroy you."  (Esqueda Dep. at 50:17-25, 86:24-25, 87:1-3.)  While this threatening conduct rises above the level of sporadic, "offensive utterances," the record provides insufficient evidence to support a conclusion that the described incidents were motivated by discriminatory animus.  Plaintiff himself conceded that both incidents were caused by Dagher becoming upset about patient care because of Plaintiff's lack of preparation during rounds or in the OR.  (Id. at 87:1:18, 168-69.)  Esqueda further conceded that these kinds of outbursts were typical in a high stress environment like the OR.  (Id. at 168-69.)  Therefore, Plaintiff has proffered insufficient evidence to show that these incidents contributed to a hostile work environment motivated by prejudice against Plaintiff on the basis of his national origin or race.

    For the foregoing reasons, the Court finds that Plaintiff has failed to frame a triable issue regarding the objective severity or pervasiveness of any discriminatory harassment he endured, and that Defendants are entitled as a matter of law to summary judgment dismissing the entirety of Plaintiff's federal hostile work environment claims.

Discrimination

Plaintiff asserts that he was subjected to discrimination because of his race and national origin. (See generally Complaint.) "To prevail on a disparate treatment claim under Title VII, plaintiffs must establish that they have suffered an 'adverse job action under circumstances giving rise to an inference of discrimination.'" Banks, 81 F.4th at 269 (citation omitted). Plaintiff may prove such discrimination by direct evidence of intent to discriminate or by indirectly showing circumstances giving rise to an inference of discrimination. Id. at 270. In evaluating both Title VII and Section 1981 discrimination claims where the plaintiff lacks direct evidence of discriminatory conduct, the Court applies the familiar burden shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Alvarado v. United Hospice, Inc., 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022) (citing Littlejohn v. City of New York, 795 F.3d 297, 312 (2d Cir. 2015)). At the first step of McDonnell Douglas, the plaintiff bears the burden of establishing a prima facie case of discrimination by showing that: "(1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012) (citation omitted). "A plaintiff's burden of establishing a prima facie case is de minimis." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001) (citation omitted).

If the plaintiff proffers a prima facie case, the burden of production shifts to the employer to rebut the presumption of unlawful discrimination by proffering a legitimate, nondiscriminatory reason for the adverse employment action. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). The employer need not prove by a

preponderance of evidence that the challenged action was not the product of discrimination, "but may simply 'present clear and specific reasons for the action.'" Gibbs v. Cons. Edison Co. of N.Y., Inc., 714 F. Supp. 85, 89 (S.D.N.Y. 1989) (quoting Neale v. Dillon, 534 F. Supp. 1381, 1387 (E.D.N.Y. 1982), aff'd, 714 F.2d 116 (2d Cir. 1982)).

If an employer is able to rebut the presumption of discrimination raised by the prima facie case, the Court's final task on a motion for summary judgment is to "examin[e] the entire record," using a case-specific approach, "to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff," Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000) (internal quotation marks omitted), "without the aid of the presumption" of unlawful discrimination. Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir. 2008); see also Holtz v. Rockefeller & Co., 258 F.3d 62, 81 (2d Cir. 2001) ("After each party has satisfied [their] initial burdens under McDonnell Douglas, the plaintiff's ultimate burden of persuasion is the burden she bore from the outset – to persuade the trier of fact that she was the subject of illegal discrimination."). To defeat summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors.'" Holtz, 258 F.3d at 78-79 (citations omitted).

Plaintiff alleges that he suffered adverse employment actions during his fellowship that can be grouped into two categories: (1) his unfavorable schedule and denial of vacation requests, and (2) his ultimate termination.

Scheduling

Plaintiff asserts that he suffered an adverse employment action when he was forced to work longer hours, weekends, and holidays more often than his Caucasian, American-born co-fellows.  (Complaint.)  Specifically, Plaintiff asserts that he was forced to cover for his co-fellows while they took off for the observance of certain holidays.  (Pl. Mem. at 5; see also Esqueda Dep. at 98-99.)  Plaintiff further argues that he was denied vacation while he "never personally observed" Dagher denying vacation for his co-fellows.  (Pl. Mem. at 5.)

Under the recently clarified standard of Muldrow v. City of St. Louis, Missouri, 601 U.S. 346, 359 (2024), the denial of vacation requests, and/or setting of an unfavorable work schedule may constitute adverse employment actions within the meaning of Title VII.  See Darwin v. Newburgh Operations, LLC, No. 22-CV-0872-LTS, 2025 WL 722791, at *2 (S.D.N.Y. Mar. 6, 2025) ("A plaintiff pleading employment discrimination need only show 'some harm' with respect to an 'identifiable term or condition of employment' to establish an adverse employment action." (quoting Muldrow, 601 U.S. at 345-55)).  Plaintiff has failed, however, to proffer sufficient evidence to establish a genuine dispute as to whether his scheduling constituted an adverse action giving rise to an inference of discrimination.

Regarding holiday coverage, Plaintiff testified that he and his co-fellows were expected to work out a schedule amongst themselves for coverage, which was agreed upon with supervisory input.  (Esqueda Dep. at 97-99.)  Plaintiff testified that he felt it was discriminatory that his co-fellow, Shani Fruchter, "just assumed" that he would cover her work during religious holidays and Thanksgiving.  (Id.)  Esqueda does not, however, testify that he brought these issues to the attention of his supervisors, nor that he was told by any of his supervisors that he was required to cover Fruchter's requested days off.  (See generally id.)  When asked if his vacation

requests were ever denied, Esqueda testified, "One time I asked Dr. Dagher . . . can I take that weekend, next weekend off? And he said something like, no, no, no, right now you cannot take it." (Id. at 98:16-19.) Esqueda further testified that he did not know if his co-fellows were denied any weekends off nor did he know why his co-fellows were given any particular holidays or weekdays off. (Id. at 98:24-25, 99:1-7.) Esqueda offers no other testimony or evidence to support his assertion that he was denied time off more frequently than his co-fellows. Nor does Esqueda offer evidence to support his contention that he worked longer hours than other similarly situated co-workers. Although he testified that he was asked to work unreasonably long hours (including, on one occasion, a 25-hour shift), Plaintiff also testified that he lacked firsthand knowledge regarding his co-fellows' "exact" hours and uncontroverted evidence in the record establishes that shifts lasting 25 hours and longer are a common expectation of a surgeon's job. (See id. at 90:10-12, 234-35; see also Gelb Decl. ¶ 30.)

To establish his prima facie case, Esqueda has the burden of proffering facts that, if credited, are sufficient to show that he was subjected to an adverse employment action under circumstances giving rise to an inference of discriminatory intent. He first attempts to establish such discriminatory intent through his allegations of disparate treatment in comparison to his Caucasian, American co-fellows, Holly Foote and Shari Fruchter. (Pl. Mem. at 5.) A disparate treatment claim can be established by "showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group[.]" Abdul-Hakeem v. Parkinson, 523 F. App'x 19, 20 (2d Cir. 2013). To satisfy his burden, however, Plaintiff must show that he was "similarly situated in all material respects" to his co-fellows, which he has not done. Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). Aside from his conclusory assertions that he worked longer hours and was denied vacation more often than his co-fellows,

Plaintiff presents <u>no</u> evidence that he worked meaningfully longer hours or more frequent holidays or weekends as compared to his co-fellows.[5]  Indeed, Plaintiff proffers only a single example of an incident in which his supervisor, Dagher, denied his request to take "next weekend" off; Plaintiff offers no further details regarding this incident to support his contention that his vacation was denied for discriminatory reasons.  Nor has Plaintiff provided evidence of any analogous situation in which a co-fellow was granted a similar request, let alone any situation where a co-fellow, "similarly situated in all material respects," was granted such a request.  To the extent that Plaintiff argues that an inference of discrimination arises from the fact that NYU granted Shari Fruchter days off in observance of religious holidays, Plaintiff does not argue that he was ever denied vacation for religious holidays.  (<u>See</u> Esqueda Dep. at 93:20-23.)

For these reasons, the Court finds that Plaintiff has failed to establish a triable issue of fact as to whether he was subjected to discrimination within the meaning of Title VII or Section 1981 with respect to his work schedule or vacation requests, and grants Defendants' Motion with respect to these claims.

<u>Termination</u>

Plaintiff also asserts a claim for discrimination under federal law, alleging that his employment was terminated because of discriminatory animus.  (Complaint ¶ 72.)  In this motion practice, Plaintiff fails to proffer any arguments in support of the allegations in the Complaint that his termination occurred under circumstances giving rise to an inference of

---

[5]     During his deposition, the only substantiation Plaintiff provided for his assertion that he worked longer hours were his complaints that Shari Fruchter was allowed to live further away from the hospital in Brooklyn and consequently was less available for emergency and night calls, and that he was asked to cover for Holly Foote on one occasion when she was ill.  (<u>See</u> Esqueda Dep. at 234-36.)  In this motion practice, Plaintiff does not argue that either circumstance evinces discriminatory intent.

discriminatory intent. (See Pl. Mem.)  Instead, he characterizes his termination as retaliatory, a claim that the Court examines below.  Because Defendant seeks summary judgment as to all of the claims asserted in the Complaint the Court has also considered whether the record is sufficient to frame a triable issue of fact as to whether the termination of Plaintiff's employment was the product of prohibited discrimination.  For the following reasons the record, even viewed in the light most favorable to Plaintiff, provides no factual basis for an ultimate conclusion that the termination was motivated by discriminatory intent.

At the first step of the McDonnell Douglas analysis, Plaintiff has framed triable issues satisfying his de minimis prima facie burden.  The undisputed record shows that Plaintiff was terminated by Dagher's direct involvement, and that circumstances gave rise to an inference of Dagher's discriminatory intent.  Plaintiff was terminated following Dagher's December 30, 2019, email to Pachter, recommending the termination because of Plaintiff's continued poor performance.  (Dagher Decl. at Ex. X.)  Pachter, who never met Plaintiff, then terminated his employment at Dagher's recommendation.  (Dagher Decl. at Ex. Y.)  No other individual defendants or non-parties were alleged to be involved in the final termination decision.  As discussed above, Plaintiff has provided evidence of Dagher's discriminatory remarks and conduct that could support an inference that Dagher may have caused his termination with invidious intent.  (See, e.g., Esqueda Dep. at 86:12-21.)

In response, Defendants have proffered significant evidence that Plaintiff's termination was the result of a seven-month long process of deficiency notices, improvement plans, and performance evaluations,[6] which consistently demonstrated that Plaintiff was

---

[6]    The Court also notes that, although all of Plaintiff's performance evaluations were filled out by Dagher, evidence on the record shows that several of Plaintiff's supervisors lodged contemporaneous complaints regarding his poor performance.  (See, e.g., Dagher Decl. at

performing below expectations.  (See Dagher Decl. at Ex. D-T.)  Plaintiff was notified of these

areas of deficiency, which included concerns regarding his failure to communicate in a

professional and timely manner.  (See, e.g., Remediation Plan.)  Despite these notices, on the

night of December 8, 2019, Plaintiff failed to respond to several texts and phone calls from his

attending surgeon, Dr. Stewart-Lewis, for a significant period of time while he was on call.[7]

(Dagher Decl. at Ex. T ("Suspension Notice").)  Subsequently, Defendants chose to place

Plaintiff on administrative leave and, ultimately, to terminate his employment.  (Leave Notice;

Termination Notice.)  These reasons provide a legitimate, nondiscriminatory explanation for

Plaintiff's termination.

At the final stage, Plaintiff bears the burden of showing that Defendants' proffered

explanation is pretextual and that his termination was at least partially motivated by

discriminatory animus.  This he has failed to do.  Plaintiff proffers no evidence to support the

conclusion that his consistently poor performance evaluations, made by a variety of supervisors

who were not alleged to have engaged in any discriminatory conduct, were unreliable or

discriminatory.  (See Gelb Decl. at Exs. A, B, C, D; Dagher Decl. at Exs. C, J, K.)  Additionally,

---

Ex. C (email from co-fellow regarding an alleged incident of Plaintiff's abusive conduct),
J (email from Nurse Practitioner regarding Plaintiff's ineffective treatment plans), K
(email from Nurse Practitioner regarding Plaintiff's unprofessionalism); Gelb Decl. ¶ 29
("Plaintiff's lack of knowledge regarding plaintiff care was so bad at one point, I reached
out to Dr. Dagher, the head of the program, and asked whether we should check whether
Plaintiff had actually graduated from medical school."), id. at Exs. A, B, C, D
(collectively, Dr. Gelb's emails commenting on Plaintiff's lack of progress and
unprofessionalism at various points throughout his Remediation Plan).)  Plaintiff
concedes these supervisors never made any sort of discriminatory remarks or
demonstrated an intent to discriminate.  (See Esqueda Dep. at 165-66.)

[7]     Although Plaintiff purports to dispute these facts, Plaintiff does not offer any evidence
that contradicts Defendants' factual proffer, other than to concede that he took around
fifty minutes to respond to Stewart-Lewis.  (Suspension Response; Esqueda Dep. at 223-
24.)

because Dagher was directly involved in both Plaintiff's hiring and termination, and was aware

at the time of Plaintiff's fellowship offer that Plaintiff was both Mexican and Hispanic (see

Dagher Decl. ¶ 11), the "same actor" inference cuts strongly against a finding of pretext in this

instance.  The Second Circuit has found this factor to be a "highly relevant" consideration at

summary judgment because when "the person who made the decision to fire was the same

person who made the decision to hire, it is difficult to impute to [him] an invidious motivation

that would be inconsistent with the decision to hire."  Schnabel v. Abramson, 232 F.3d 83, 91 (2d

Cir. 2000) (quotation omitted).  The fact that Dagher knew of Plaintiff's protected characteristics

when he hired Plaintiff and when he renewed Plaintiff's fellowship cuts strongly against any

discriminatory inference that arises from Dagher's alleged discriminatory remarks and conduct.

Because Plaintiff offers no other evidence to create a triable issue as to whether

Defendants' proffered reason for his termination was a pretext for discrimination, the Court finds

that Defendants are entitled to summary judgment dismissing Plaintiff's federal discrimination

claims premised on Plaintiff's termination.

Retaliation

Retaliation claims under Title VII and Section 1981 are also evaluated under the

McDonnell Douglas burden shifting standard.  See Banks, 81 F.4th at 275.  Plaintiff must first

demonstrate his prima facie case by presenting evidence supporting a triable issue of fact that

(1) he participated in a protected activity, (2) the defendant knew of the activity, (3) Plaintiff

suffered an adverse employment action, and (4) there was a causal connection between the

protected activity and the adverse action.  Szwalla v. Time Warner Cable LLC, 670 F. App'x

738, 740 (2d Cir. 2016) (summary order).  If Plaintiff can establish his prima facie case, the

burden then shifts to the Defendants to offer a permissible, non-retaliatory explanation for the

adverse employment action.  Gibbs, 714 F. Supp. at 89.  Finally, the burden shifts back the

Plaintiff to offer proof that would enable a reasonable fact finder to conclude that Defendants'

proffered reason was a pretext for prohibited retaliation.  Reeves, 530 U.S.at 143.

   Plaintiff argues in opposition to Defendants' Motion that he was retaliated against

when he was terminated shortly after making a protected complaint regarding workplace

discrimination.  (Pl. Mem. at 6-7.)  Plaintiff has proffered facts sufficient to support his prima

facie case for retaliation against NYU, Pachter, and Dagher.[8]  Dagher and Pachter both received

the Suspension Response, and it is thus undisputed that they both were aware that Plaintiff

engaged in a protected activity when he reported discrimination in his Response.  (Suspension

Response; Def. 56.1 ¶ 44; see also generally Dagher Decl.; Pachter Decl.)  Furthermore, Dagher

and Pachter both participated directly in the decision to terminate Plaintiff a mere nine days after

he submitted his Suspension Response.  (Dagher Decl. at Ex. X ("Dagher Email"); Ex. Y

("Termination Notice").)  At the prima facie stage, the temporal proximity between the

Plaintiff's protected complaint and his termination, by itself, can establish a sufficient causal

connection.  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010).

   The next step of the McDonnell Douglas analysis requires the Court to consider

Defendants' nonretaliatory explanation.  As discussed above, Defendants have offered abundant

evidence to support their contention that Plaintiff was terminated due to his substandard

performance, following a protracted remediation plan designed to identify and ameliorate the

---

[8]  It is undisputed, however, that Lonze, Gelb, and Stewart-Lewis were unaware of
Plaintiff's discrimination complaint and played no role in his termination.  (See Lonze
Decl. ¶ 19; Gelb Decl. ¶ 31; Stewart-Lewis Decl. ¶ 71.)  Because Plaintiff has failed to
present evidence showing that Lonze, Gelb, or Stewart-Lewis knew of his protected
activity or took any adverse action against him in response to that activity, those
Defendants are entitled to summary judgment dismissing his Section 1981 retaliation
claims against them.

areas of Plaintiff's deficiencies. (See Dagher Decl. at Ex. D-T.) Prior to any protected activity, Plaintiff was notified of these Remediation Plans, consistently evaluated as performing "below average," and informed of potential disciplinary action if his performance did not improve. (See, e.g., Notice of Probation; Dagher Decl. at Exs. E, F, I, M, P (various performance evaluations and performance improvement plans).) Therefore, the Court finds that Defendants have satisfied their burden of showing a non-retaliatory motive for Plaintiff's termination that well predated any protected activity.

At the final stage, the burden shifts back to Plaintiff to present evidence creating a triable issue of fact as to whether Defendants' purported motivation for his termination was pretextual. He has again failed to do so. From the evidence of record, it is undisputed that, for seven months prior to Esqueda's protected activity, Defendants repeatedly noted his deficient performance and notified him of key areas of critical deficiency requiring improvement. It is undisputed that, despite his employers identifying the need for greater professionalism and communication, and prior to any protected activity, Esqueda was suspended as a result of an incident wherein he took at least fifty minutes to respond to an attending physician while on call. (Leave Notice; Suspension Response.) Although Dagher ultimately recommended Plaintiff's final termination shortly after Plaintiff's discrimination complaint, the record demonstrates that the procedures pointing to performance-based termination were set in motion long before the protected complaint. See Piligian v. Icahn Sch. of Med. at Mount Sinai, 490 F. Supp. 3d 707, 722 (S.D.N.Y. 2020) ("It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity." (internal citation omitted)); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d. Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse

job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").  Therefore, Plaintiff has failed to frame a triable issue regarding whether Defendants' proffered motive was pretextual.

The Court finds that Defendants are entitled to summary judgment dismissing Plaintiff's federal retaliation claims.

State and Local Law Claims

Because the Court grants the Defendants' motion for summary judgment dismissing all of Plaintiff's federal claims, the Court has the discretion to decide whether to exercise supplemental jurisdiction of Plaintiff's remaining state and local law claims.  See Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966); 28 U.S.C. § 1367(c) (Westlaw through P.L. 119-18) (providing that court may decline to exercise supplemental jurisdiction where, inter alia, the claim "substantially predominates over the claim or claims over which the district court has original jurisdiction" and where "the district court has dismissed all claims over which is has original jurisdiction").  The Court must consider "the values of judicial economy, convenience, fairness, and comity" to determine whether to exercise supplemental jurisdiction.  Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988).  The Supreme Court has noted that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of [these] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  Id. at 350.

Because all of the claims of which the Court has original federal question jurisdiction are being dismissed and state and local law claims clearly dominate what would remain of this litigation, the Court declines to exercise supplemental jurisdiction of these claims

and dismisses them without prejudice to litigation in a forum of competent jurisdiction.  <u>See</u> 28

U.S.C. § 1367(c).

C<span style="font-variant:small-caps">ONCLUSION</span>

For the foregoing reasons, the Court grants Defendants' motion for summary

judgment.  The Court grants judgment in favor of Defendants, dismissing Plaintiff's federal

hostile work environment, discrimination, and retaliation claims.  The Court declines to exercise

supplemental jurisdiction of Plaintiff's remaining state and local law claims and dismisses those

claims without prejudice to litigation in a forum of competent jurisdiction.

This Memorandum Opinion and Order resolves docket entry no. 65.  The Clerk of

Court is respectfully directed to enter judgment and close this case.

SO ORDERED.

Dated: New York, New York
       June 27, 2025

                                    /s/ Laura Taylor Swain
                                    LAURA TAYLOR SWAIN
                                    Chief United States District Judge